IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEFFREY SHIVLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CV 07-270-MO |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of Social ) | OPINION AND ORDER |
| Security, ) | |
| ) | |
| Defendant. ) | |

MOSMAN, J.,

    Plaintiff Jeffrey Shivley challenges the Commissioner's decision denying his application for supplemental security income payments under Title XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). I AFFIRM in part, REVERSE in part, and REMAND the Commissioner's decision .

1 - OPINION AND ORDER

I.   **Background**

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). On December 19, 2006, the ALJ found Mr. Shivley not disabled. Mr. Shivley argues the ALJ improperly assessed his residual functional capacity ("RFC"), thereby undermining the conclusion at step five of the decision-making process. He also contends the ALJ failed to resolve an apparent conflict between the testimony of the vocational expert ("VE") and information in the United States Department of Labor publication *Dictionary of Occupational Titles* (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm ("DOT").

II.  **Discussion**

A.   **RFC Assessment**

The RFC is an assessment of the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by his impairments. 20 C.F.R. § 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 at *5.

Mr. Shivley challenges the RFC assessment on the grounds that the ALJ improperly rejected his testimony and the testimony of his wife and failed to consider the side effects of his medications.

Mr. Shivley contends these errors produced an RFC assessment that did not accurately reflect his actual functional limitations.

Mr. Shivley alleged he became disabled on March 31, 1999, due to epilepsy, acid reflux, residual effects of a surgical repair of burst discs in the cervical spine, and degenerative disc disease resulting in chronic back pain. (Admin. R. 93, 105.)

Mr. Shivley testified that pain in his left shoulder and neck prevent him from lifting or carrying with the left arm, *Id.* at 357-58, and the pain has worsened since his most recent seizure in March 2006. *Id.* at 485-86. He also stated that, while right-handed, he has numbness in the fingers of his left hand. *Id.* at 360-61. He testified that it is painful to stand up, take a step, or walk. *Id.* at 352, 360.

According to Mr. Shivley's testimony, on a typical day, he goes directly from bed to a recliner, where he listens to books on tape or watches television. *Id.* at 490. His medications include narcotics and a benzodiazapine which make him groggy and unsteady on his feet. *Id.* at 493. On warm days, he tries to walk around his yard for fifteen to twenty minutes with help from his wife and then returns to the house to lie down. *Id.* Finally, Mr. Shivley testified he spends most of the day lying down, but tries to sit up at least an hour or two during the day. *Id.* at 361, 491-92.

The ALJ believed that Mr. Shivley experienced some degree of pain, numbness and weakness. However, he did not accept Mr. Shivley's statements concerning the intensity, persistence and limiting effects of these symptoms. *Id.* at 384. The ALJ found Mr. Shivley retained the RFC to perform a medium level of exertion, excluding work involving exposure to hazards, such as heights and moving machinery, and jobs that would require reading and writing. *Id.* at 383. The

ALJ discredited Mr. Shivley's assertions of limitations in excess of this RFC assessment and the contention that he is unable to perform any work.

In deciding whether to accept subjective symptom testimony, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce some degree of the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). The ALJ found Mr. Shivley had satisfied the first stage. (Admin. R. 384.)

In the second stage of the credibility analysis, an ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. He may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id*. at 1284. In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id.;* SSR 96-7p, 1996 WL 374186.

Here the ALJ considered proper factors and made specific findings to support his credibility determination. The ALJ found the objective medical evidence supported diagnoses of degenerative disc disease of the lumbar and cervical spine and a seizure disorder, but did not support Mr. Shivley's assertions regarding the debilitating functional limitations he experienced. (Admin. R. 381.)

On March 31, 1999, Mr. Shivley was treated for a grand mal seizure. Objective findings were generally benign, including a negative CT scan of the head. *Id.* at 168-70. Mr. Shivley's neurologist, Jerry Boggs, M.D., prescribed Neurontin, although the etiology of the seizure remained unclear. *Id.* at 270. Mr. Shivley's most recent previous seizure had been ten years earlier, and was thought to have been secondary to drug abuse. *Id.* at 168.

On October 25, 1999, Dr. Boggs reported Mr. Shivley had a generalized seizure disorder that was well-controlled on Neurontin. *Id.* at 199. Mr. Shivley had not experienced further seizure activity or side effects from his medication. *Id.* On March 20, 2000, Dr. Boggs completed a seizure questionnaire noting Mr. Shivley had excellent control of his seizure disorder with Neurontin. *Id.* at 197-98.

Mr. Shivley had no further seizure activity for nearly seven years. On March 30, 2006, Mr. Shivley reportedly experienced another seizure, although medical records do not reflect any urgent care at the time. He reported this seizure to his primary care provider, Steve Eddy, F.N.P., several days later. *Id.* at 461. Dr. Boggs ordered an EEG study which showed only mild abnormalities amenable to continued conservative treatment with Neurontin. *Id.* at 475, 478.

Based on these sparse and minimal objective findings, the seven year interval between seizures, the complete absence of symptoms and adverse side effects from Neurontin during the interval between seizures, and the opinion of Dr. Boggs, it was reasonable for the ALJ to conclude that Mr. Shivley's seizure disorder was under control.

On November 30, 1998, an MRI showed degenerative changes in the lumbar spine with minimal disc bulges at two disc spaces which were "probably not clinically significant." *Id.* at 171. Steven Wells, M.D., concluded the MRI did not support radiculopathy, contrary to Mr. Shivley's

5 - OPINION AND ORDER

complaints of pain radiating into his legs. *Id.* at 273. On April 20, 2000, an MRI of the lumbar spine showed the same degeneration as the November 1998 scan, except the disc bulges were less prominent. *Id.* at 253. Dr. Boggs' clinical findings on physical examination, together with the MRI, suggested a low probability of lumbosacral radiculopathy. Dr. Boggs did not support surgical intervention. *Id.* at 191.

On July 16, 1999, an MRI of the cervical spine showed a herniated nucleus pulposus on the left side at C6. *Id.* at 167. A follow-up MRI showed disc material protruding at C7-T1 and C6-7. *Id.* at 201-02. On January 28, 2000, neurosurgeon Paul Amstutz, M.D., performed a posterior cervical diskectomy. *Id.* at 154-56.

On May 24, 2000, Dr. Amstutz obtained normal clinical findings on physical examination, except "giveaway weakness in all muscle groups and the deltoid down the L side" that did not appear to be organic. *Id.* at 209. On June 1, 2000, he found no deficits on physical examination of Mr. Shivley's neck, shoulders, and upper extremities. Dr. Amstutz ordered a repeat MRI of the cervical spine, which, when compared to the pre-operative MRI studies, showed all nerve roots had adequate room without any neural compression. He found no evidence of any recurrent disc rupture. *Id.* at 207-208. In addition, Dr. Boggs obtained an EMG study, which showed no abnormalities in the cervical spine. The pain Mr. Shivley described to Dr. Boggs was atypical for radiculopathy. *Id.* at 188-89.

Mr. Shivley then reported doing well, staying active, and receiving adequate pain relief from narcotic pain medications for several years. In addition, except for brief episodes of acid reflux and elbow pain from a lateral epicondyle, the record does not include objective or clinical findings concerning Mr. Shivley's degenerative disc disease during this period.

6 - OPINION AND ORDER

Mr. Shivley sought reevaluation of his neck and left arm pain in February 2006. *Id.* at 463. A new MRI study showed disc bulges in the cervical spine which could cause impingement of nerve roots on the left and produce symptoms in the left arm. *Id.* at 462, 470. On June 14, 2006, Dr. Boggs indicated clinical findings from physical examination and objective findings from the MRI scan supported a left C5-6 radiculopathy. *Id.* at 475.

These objective findings support degenerative disc disease with associated pain in the lower back and neck. However, they do not support the presence of nerve root compression that might result in radiculopathy in the upper and lower extremities until February 2006. Accordingly, the ALJ could reasonably conclude these findings reflected adversely on the credibility of Mr. Shivley's complaints of pain and numbness radiating to his legs and left arm, which he claimed left him essentially bedridden throughout the period at issue. Although the objective and clinical medical findings beginning in February 2006 appear to be consistent with Mr. Shivley's assertions of radiating pain and numbness in the left upper extremity, they do not support the presence of such pain and numbness from the alleged date of onset or the extreme functional limitations Mr. Shivley alleged.

The ALJ also found Mr. Shivley's treatment history showed a disinterest in following medical advice and accordingly diminished the credibility of his statements. *Id.* at 384-85. Dr. Wells repeatedly urged Mr. Shivley to strengthen his back and increase his range of motion with physical therapy, stretching, exercise, and other treatment modalities, but Mr. Shivley persistently refused to follow these treatment recommendations. *Id.* at 267, 272, 273, 275. A short time after the alleged onset of Mr. Shivley's disability, Dr. Wells noted Mr. Shivley "continues to state he will

not consider PT or other modalities for his back pain and just wishes higher doses of narcotics."
*Id.* at 270.

In October 1999, Dr. Wells noted:

> On the one hand Jeff says he is totally dysfunctional because of his numbness in his hand, he is stating it is keeping him from playing the guitar, keeping him from doing other activities of daily living which are very important to him. On the other hand he has not followed through with PT and when asked why he states he just did not ever call physical therapist.

*Id.* at 266.

There is no evidence in the record suggesting Mr. Shivley ever attempted any of these recommended modalities, instead relying solely on narcotic pain relief. The ALJ could reasonably conclude that if Mr. Shivley's symptoms were as severe as he described in his testimony, he would have considered the treatment modalities recommended by those giving him medical care.

The ALJ also pointed out that some of Mr. Shivley's providers believed he exaggerated his assertions of debilitating pain to obtain narcotics. *Id.* at 385. For example, in September 1998, Dr. Wells threatened to terminate Mr. Shivley's narcotic prescription unless he also participated in other treatment modalities. *Id.* at 275. In April 1999, Mr. Shivley and his brother made insistent and threatening telephone calls to Dr. Wells's clinic trying to obtain refills of Xanax and Vicodin. After consulting with Dr. Boggs regarding this behavior, Dr. Wells refused the medications. *Id.* at 270. In November 1999, Mr. Shivley tried to persuade Dr. Wells to increase the dose of narcotics, but Dr. Wells refused. *Id.* at 265. In February 2000, Dr. Amstutz noted that Mr. Shivley needed to wean himself from narcotics. Dr. Amstutz refused another request from Mr. Shivley for more pain medication and indicated "the [patient] obviously continues with his drug-seeking behavior." *Id.* at

211. In addition, Mr. Shivley attempted to persuade Dr. Wells to write a letter stating he had intractable pain requiring medical marijuana. *Id.* at 270, 272.

Mr. Shivley relies on the statement and treatment records of Mr. Eddy. Mr. Eddy treated Mr. Shivley after Drs. Wells and Amstutz and indicated Mr. Shivley did not exhibit drug-seeking behavior while he was Mr. Eddy's patient. *Id.* at 306. Even if Mr. Eddy's statement is accepted completely, it does not negate the observations of Drs. Wells and Amstutz regarding drug-seeking behavior during the time they treated Mr. Shivley. An ALJ is entitled to consider a claimant's prior statements about symptoms that appear to be less than candid in evaluating credibility. SSR 96-7p, 1996 WL 374186. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (ALJ properly concluded the claimant's complaints were not credible based on the likelihood claimant was exaggerating complaints of physical pain to obtain prescription pain medications).

To the extent the opinions of Drs. Wells and Amstutz regarding drug seeking behavior conflicted with that of Mr. Eddy, resolving such conflicts is the ALJ's responsibility. *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). The ALJ gave greater weight to the opinions of the two treating physicians based on reasonable inferences drawn from the evidence, including Mr. Shivley's past drug abuse and the treatment notes of Drs. Wells and Amstutz. Because the evidence can reasonably support the ALJ's conclusion, this court may not substitute its judgment. *Lewis*, 236 F.3d at 509.

The ALJ also cited the opinions of Mr. Shivley's physicians regarding the extent of his functional limitations. (Admin. R. 385.) For example, in March 2000, Dr. Boggs remarked on Mr. Shivley's prognosis:

9 - OPINION AND ORDER

> The patient's prognosis concerning his seizure disorder is excellent, given his current control is quite good on Neurontin. I suspect also that his neck pain will improve with time in view of the fact that he has had surgical decompression of the problem that was initially causing his pain.

*Id.* at 196.

In August 2000, Dr. Amstutz noted Mr. Shivley had failed to return to his clinic for further study and treatment as advised. He stated: "At this point though, we do not feel he is permanently and totally disabled. We feel that he is capable of at least sedentary type work." *Id.* at 206.

In June 2003, Mr. Eddy wrote to support Mr. Shivley's claim, indicating Mr. Shivley had not exhibited drug-seeking behavior. He continued: "Disability is another matter. I have no reason to think that Jeff is completely disabled and would be unable to work at all." *Id.* at 306. In July 2004, Mr. Eddy recommended a formal evaluation to determine Mr. Shivley's actual limitations because "there is no documentation of [any] medical condition that would cause the physical limitations that he claims." *Id.* at 438. Similarly, in August 2004, Mr. Eddy indicated "there is no physiological reason for him not to use his arm." *Id.* at 437. Mr. Shivley argues these statements suggesting he is not disabled do not support the ALJ's RFC assessment. That argument misses the point that the statements diminish the credibility of his testimony regarding the extent of his functional limitations. The ALJ could rationally conclude that Mr. Eddy's statements weigh heavily against Mr. Shivley's assertion that he is essentially bedridden.

The ALJ also relied on contradictions between Mr. Shivley's testimony and his reports to treating sources. *Id.* at 385. Contrary to the extremely limited activities and severe pain Mr. Shivley described in his testimony, he consistently told Mr. Eddy he was doing well and had good pain control. Similarly, contrary to Mr. Shivley's present assertion of adverse medication side effects

10 - OPINION AND ORDER

causing drowsiness and instability on his feet, he consistently denied adverse side effects in his reports to Mr. Eddy.

For example, Mr. Eddy's treatment notes reflect that Mr. Shivley reported "good relief of pain and no adverse effects" from medications (*Id.* at 294); "chronic back pain which is made tolerable by his pain meds" and no adverse side effects (*Id.* at 293); "good pain relief with Oxycontin that lasts all day" with no side effects(*Id.* at 291); and "excellent relief of pain" without adverse side effects of the medication (*Id.* at 305). Mr. Shivley repeatedly indicated his pain medication gave him adequate relief "enabling him to remain active" and "enjoy a high quality of life." *Id.* at 431, 433, 441, 443, 464.

Although Mr. Shivley's level of well-being was interrupted by brief periods of inadequate pain relief due to flare ups of elbow pain from a recurring lateral epicondryle and changes in medication due to insurance coverage, in general he consistently reported doing well and remaining active while a patient of Mr. Eddy from 2000 to 2006. These reports are inconsistent with the extremely debilitated condition Mr. Shivley described in his hearing testimony.

The ALJ's reasons for discrediting Mr. Shivley's testimony are clear and convincing and rest on reasonable inferences drawn from the evidence in the record as a whole. *Dodrill*, 12 F.3d at 918; *Smolen*, 80 F.3d at 1283. The ALJ's findings are sufficiently specific to permit this court to conclude he did not discredit Mr. Shivley's testimony arbitrarily. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Accordingly, the ALJ's credibility determination is sustained.

Mr. Shivley contends the ALJ failed to properly consider the testimony of his wife. Mrs. Shivley testified that Mr. Shivley has had numbness in the left arm and hand since suffering a grand mal seizure in March 1999, and that Mr. Shivley complains about neck pain and pre-existing pain

11 - OPINION AND ORDER

in his lower back. Mrs. Shivley said she helps her husband put on his socks and shoes, remember to take his medications, shower, shave and get down stairs. (Admin. R. 363, 495.) Mr. Shivley does moderate, light things around the house, such as taking out the garbage and building a fire. *Id.* at 364, 496. In the past, Mr. Shivley drove Mrs. Shivley across town to the store and took their children to school, but he lost his driver's license after his seizure in March 2006. *Id.* at 364, 496. About five days a week, Mr. Shivley stays in bed all day and night except to go to the bathroom and eat. *Id.* at 367. He walks around the yard a little bit for stretching and exercise. *Id.* at 496.

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2006). Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount the testimony of a lay witness, he must give reasons that are germane to the witness. *Dodrill*, 12 F.3d at 919.

The ALJ considered Mrs. Shivley's testimony and believed she testified honestly about her observations of Mr. Shivley's behavior and her own beliefs about his symptoms. (Admin. R. 385.) However, he found the statements of medical providers more persuasive regarding the functional limitations resulting from his medical condition. *Id.* As described previously, treating sources stated Mr. Shivley's medical condition did not preclude all work. Unlike Mrs. Shivley's observations, these statements were based on clinical and objective medical findings and the relationship between Mr. Shivley's medical condition and his functional deficits. The statements reflect Mr. Shivley's reports of excellent pain control without side effects. They are consistent with Mr. Shivley's failure to follow medical advice to strengthen his back through physical therapy, exercise and stretching.

12 - OPINION AND ORDER

Accordingly, the ALJ's decision to give greater weight to the statements of medical providers than to those of Mrs. Shivley is based on reasonable inferences drawn from substantial evidence in the record as whole.

In summary, the three grounds upon which Mr. Shivley challenges the ALJ's RFC assessment fail. The ALJ considered all of the allegations of limitations and restrictions and accepted those that were consistent with record as a whole. SSR 96-8p, 1996 WL 374184. The ALJ's evaluation of the testimony of Mr. Shivley and his wife and the evidence of medication side effects was based on reasonable inferences drawn from the record as a whole. Because the ALJ's interpretation of the evidence is rational, it should be upheld. *Batson*, 359 F.3d at 1193; *Lewis*, 236 F.3d at 509; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

### B.  Vocational Testimony

The ALJ relied on testimony from the VE describing representative occupations that would be suitable for a person with Mr. Shivley's RFC. Mr. Shivley contends the VE's testimony conflicts with information in the DOT about the occupations the VE described. Mr. Shivley argues the ALJ failed to resolve the conflict and explain the resolution as required by SSR 00-4p, 2000 WL 1898704.

As described previously, Mr. Shivley's RFC precluded jobs that require reading or writing. *Id.* at 383. The VE testified that a person with Mr. Shivley's RFC could perform unskilled occupations including hand packager, scrap sorter, and rag sorter. (Admin. R. 502.) Based on the VE's testimony, the ALJ found Mr. Shivley could perform work in the national economy exemplified by the three occupations the VE identified. *Id.* at 386-87. The ALJ did not ask the VE whether her testimony was consistent with the DOT.

Job descriptions in the DOT include a General Education Development level in language corresponding to the requisite language skills generally needed to perform that occupation. DOT, App. C. The DOT definitions for each of the three jobs identified by the VE indicate a language development level of one. A person with level one language development can "recognize [the] meaning of 2,500 (two- or three-syllable) words," "[r]ead at a rate of 95-120 words per minute," and "[p]rint simple sentences containing subject, verb, and object." *Id.*

When an ALJ receives testimony from a VE about the requirements of a job or occupation, the ALJ "has an affirmative responsibility to ask about any possible conflict" between that testimony and the information provided in the DOT. SSR 00-4p, 2000 WL 1898704 at *4. When there is "an apparent unresolved conflict between the [VE's testimony] and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [VE's testimony] to support a determination or decision whether the claimant is disabled." *Id.* at *2, *4-5. An ALJ may rely on expert testimony which contradicts the DOT, but only if the record contains persuasive evidence to support the deviation. *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).

In light of the requirements of SSR 00-4p, an ALJ may not rely on VE testimony regarding the requirements of particular jobs without inquiring whether the testimony conflicts with the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Here, the ALJ found the VE's testimony was consistent with the information in the DOT. (Admin. R. 386.) The transcript of the hearing shows that the ALJ did not ask the VE whether her testimony conflicted with the DOT and, if so, whether there was a reasonable explanation for the conflict. As a result, it is unclear whether the ALJ properly relied on her testimony or whether substantial evidence supports the ALJ's finding that Mr. Shivley can perform work. *Massachi*, 486 F.3d at 1154.

14 - OPINION AND ORDER

The ALJ's procedural error could be harmless if there were no conflict, or if the VE provided "sufficient support for her conclusion so as to justify any potential conflicts." *Massachi*, 486 F.3d at 1154 n.19. The Commissioner argues there was no conflict because the DOT language level "only represents a measure of education, either formal or informal, 'required of the worker for satisfactory job performance' and is not indicative of the tasks or nature of a particular job," whereas the actual tasks listed for the jobs do not include reading and writing. (Def.'s Br. 6-7.) This argument is unpersuasive. The DOT indicates the three occupations require reading and writing abilities for satisfactory job performance. The VE testified Mr. Shivley can perform the jobs without the ability to read and write. I have no difficulty finding an apparent conflict.

The Commissioner also argues the error was harmless because the ALJ could have found Mr. Shivley capable of performing substantially all of the full range of medium work. Had the ALJ done so, he could have reached a finding of not disabled under Rule 203.25 of the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2. This argument is also unpersuasive. There was no such finding at the administrative level. In fact, the ALJ found Rule 203.25 inapplicable because Mr. Shivley did not have the "ability to perform all or substantially all of the requirements" of the full range of medium work. (Admin. R. 386.) This court is constrained to review the reasons the ALJ asserted. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Under these circumstances, I cannot uphold the Commissioner's decision and must remand so that the ALJ can perform the appropriate inquiries under SSR 00-4p. *Massachi*, 486 F.3d at 1154-55.

**III.    Conclusion**

The ALJ's RFC assessment was based on correct legal standards and supported by substantial evidence.  Mr. Shivley's challenges to the ALJ's evaluation of his testimony, the testimony of the lay witness and the evidence of medication side effects cannot be sustained.

The ALJ's determination at step five was not based on correct legal standards and is not supported by substantial evidence.  The Commissioner's decision is remanded in part so that an ALJ can apply the requirements of SSR 00-4p and determine:  1) whether a VE can identify jobs which are consistent with the definitions in the DOT and Mr. Shivley's RFC; and 2) whether there is a reasonable explanation for any apparent conflict between the VE's testimony and the DOT.

Accordingly, the Commissioner's decision is AFFIRMED in part, REVERSED in part, and REMANDED for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this   28th   day of March, 2008.


/s/ Michael W. Mosman
Michael W. Mosman
United States District Judge